**Opinion filed February 21, 2013**



# In The

# Eleventh Court of Appeals

_____

## No. 11-12-00174-CV
_____

## GRAND AERIE FRATERNAL ORDER OF EAGLES, Appellant

## V.

## TYLER HAYGOOD, Appellee

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause No. C-130,296**

## O P I N I O N   O N   M O T I O N   F O R   R E H E A R I N G

On original submission, we held that the trial court committed reversible error when it denied the special appearance entered by Grand Aerie Fraternal Order of Eagles.  We held that for two reasons: (1) because there is not a substantial connection between Grand Aerie's contacts in Texas and the lawsuit sufficient to confer specific jurisdiction and (2) because Grand Aerie's contacts with Texas did not rise to a level that established the existence of general jurisdiction. Tyler Haygood filed a motion for rehearing in which he challenged our holding as to specific jurisdiction on two grounds.  First, Haygood argues that we mischaracterized the nature of

Haygood's claim as derivative instead of direct. Second, Haygood attacks our conclusion that there was no evidence that Grand Aerie approved alcohol-related policies, urging that it is undisputed that Grand Aerie approves the bylaws, which are the "governing authority" for social rooms. We deny the motion for rehearing, but we withdraw our opinion and judgment dated January 11, 2013, and substitute the following.

In this interlocutory appeal, Grand Aerie Fraternal Order of Eagles challenges the trial court's order in which it denied Grand Aerie's special appearance. We conclude that Grand Aerie is a nonresident corporation and that, in the context of this suit, its contacts with Texas are insufficient to establish either specific or general jurisdiction. We, therefore, reverse the judgment of the trial court and render judgment that Haygood's claims against the foreign corporation are dismissed for want of jurisdiction.

The Fraternal Order of Eagles (FOE) is a charitable organization that supports both medical centers and medical research. FOE helped establish Mother's Day, was the impetus for Social Security, and pushed to end age discrimination in the work place. FOE's hierarchy begins with the Grand Aerie and includes state and provincial aeries and local aeries. Grand Aerie is the governing body and is an Ohio corporation. Grand Aerie issues charters to local chapters and approves their bylaws as well as any amendments.

Broncho Aerie 2914 is a local aerie located in Odessa, Texas, and incorporated in Texas. Mark Perdue, a member and former president of the Broncho Aerie, had a head-on collision with Tyler Haygood and his fiancée after Perdue had consumed alcoholic beverages at the Broncho lodge one evening. The accident seriously injured Haygood and killed his fiancée and Perdue. Haygood filed a dram shop action against Broncho, the bartender, and Perdue's estate and, after discovery, amended his petition to include Grand Aerie as a defendant because it "had a duty of supervision, oversight, and/or dominion" over Broncho.

Grand Aerie filed a special appearance, challenging all bases for the trial court's exercise of personal jurisdiction over it, but the trial court denied Grand Aerie's special appearance. Grand Aerie thereafter brought this interlocutory appeal, challenging the denial of its special appearance. In its first issue, Grand Aerie contends that the evidence is legally insufficient to establish that its control over Broncho was atypical of a normal parent-subsidiary relationship. In the second and third issues, Grand Aerie asserts that the evidence is legally insufficient to

2

support a finding of general jurisdiction or special jurisdiction. In its final issue, Grand Aerie argues that this lawsuit offends traditional notions of fair play and substantial justice.

"Our special-appearance jurisprudence dictates that the plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the burden to plead sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041–.045 (West 2008); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). A defendant who challenges a Texas court's personal jurisdiction over it by special appearance must negate all bases alleged by the plaintiff. *Kelly*, 301 S.W.3d at 658. "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.*

Whether a trial court has personal jurisdiction over a defendant is a matter of law that we review de novo. *BMC Software*, 83 S.W.3d at 794. Although the trial court frequently must resolve fact questions before it determines jurisdiction, when, as here, "a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied." *Id.* at 795. But, "[w]hen the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court." *Id.* at 795 (citing *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989); *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987)). While an appellant may not challenge conclusions of law for their factual sufficiency, the appellate court may review the lower court's legal conclusions based on the facts to review their correctness. *Id.*

A nonresident defendant can negate personal jurisdiction either on a factual or legal basis. *Kelly*, 301 S.W.3d at 658. To attack jurisdiction factually, a defendant effectively disproves the plaintiff's allegations when it presents evidence that it has no contacts with Texas. *Id.* The plaintiff must then offer its own evidence that affirms its allegations or risk dismissal of its lawsuit. *Id.* To attack jurisdiction legally, a defendant can show that, even if the plaintiff's alleged facts are true, the evidence does not establish jurisdiction. *Id.* at 659. Under a legal

sufficiency challenge, we will uphold the trial court's ruling if there is "more than a scintilla of evidence to support the finding." *BMC Software*, 83 S.W.3d at 795.

Texas trial courts may exercise personal jurisdiction over a nonresident defendant only if the requirements of both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). The Texas long-arm statute extends the trial court's jurisdiction "as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575. Therefore, we must only analyze whether Grand Aerie's acts would bring Grand Aerie within Texas's jurisdiction consistent with constitutional due process requirements. Personal jurisdiction satisfies due process protections when (1) "the nonresident defendant has established minimum contacts with the forum state" and (2) "the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "We focus on the defendant's activities and expectations when deciding whether it is proper to call the defendant before a Texas court." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009).

To establish minimum contacts, a defendant must have purposely availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985). The "touchstone" of the due process analysis is "purposeful availment." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being haled into a Texas court. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Jurisdiction is premised on notions of implied consent that, by invoking the benefits and protections of a forum's laws, a nonresident consents to suit in that forum. *Michiana*, 168 S.W.3d at 785. The quality and nature of the defendant's contacts with the forum state, rather than their number, are important in the minimum contacts analysis. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 n.11 (Tex. 1991).

There are three parts to a "purposeful availment" inquiry: (1) only the defendant's contacts with the forum are relevant, rather than the unilateral acts of another; (2) the contacts

4

relied upon must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must have sought some benefit, advantage, or profit by availing itself of jurisdiction. *Moki Mac*, 221 S.W.3d at 575; *Michiana*, 168 S.W.3d at 785.

A defendant's contacts with a forum state can permit the exercise of either general or specific jurisdiction. *Guardian Royal*, 815 S.W.2d at 227–28. A trial court has specific jurisdiction over a nonresident defendant when the cause of action arises from or is related to the defendant's contacts or activities in Texas. *Retamco*, 278 S.W.3d at 338. In a specific jurisdiction analysis, the relevant facts concern the relationship between the nonresident defendant and the forum that are connected to the lawsuit. *Id.* (citing *Moki Mac*, 221 S.W.3d at 575–76). General jurisdiction is present when a defendant's contacts are continuous and systematic, permitting the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to the defendant's activities in the forum. *CSR Ltd.*, 925 S.W.2d at 595. General Jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. *Id.*

In his first amended original petition in the trial court, Haygood alleged that Grand Aerie "engages in business in Texas and did so in this suit," and he also alleged that Grand Aerie controls the "rituals and operations" of Broncho by issuing "a detailed set of policies." After Grand Aerie filed a special appearance, specifically denying all bases for jurisdiction, Haygood filed a response and alleged that the trial court had both specific and general jurisdiction over Grand Aerie because the local chapter "is under the supervision, oversight and dominion of the national GRAND AERIE." After hearing argument from both parties, the trial court denied the special appearance, but did not file findings of fact or conclusions of law. Because we must uphold the trial court's judgment under any valid theory, we review the record to determine whether the trial court could have reasonably concluded that it had either specific jurisdiction or general jurisdiction over Grand Aerie.

The minimum contacts analysis is easily muddled because parties and courts often import contacts relevant to one type of jurisdiction when deciding the other. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 165 (Tex. 2007). And even further confusing the issues, many courts "impute contacts of related entities to each other, when mere relatedness is an insufficient basis on which to confer jurisdiction." *Id.* We will first determine whether the dram

5

shop action is related to or arises from the Ohio corporation's contacts with Texas to confer specific jurisdiction, and then we will address whether the Ohio corporation, either independently or through the local chapter, has continuous and systematic contacts with Texas sufficient for general jurisdiction.

"[P]urposeful availment alone will not support an exercise of specific jurisdiction . . . unless the defendant's liability arises from or relates to the forum contacts." *Moki Mac*, 221 S.W.3d at 579. Unlike general jurisdiction, which requires a more demanding minimum contacts analysis, specific jurisdiction may be asserted when the defendant's forum contacts are isolated or sporadic but the plaintiff's cause of action arises out of those contacts with the state. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010). We look for a "substantial connection" between the defendant's Texas contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585. Thus, the only contacts relevant to our specific jurisdiction analysis are the contacts between Grand Aerie and Texas that are connected to the alleged improper alcohol service that is the center of the litigation.

Haygood argued to the trial court that he is not required to show how failing to procure insurance is "somehow proximately related" to the underlying accident; instead, Haygood avers that by pleading "a control-based tort with specific allegations of controlling a Texas entity, he triggered the Grand Aerie's burden to 'negate all possible grounds for personal jurisdiction.'" Haygood relies on a line of cases that subjects a principal to liability who entrusts work to another and retains control of part of the work. *See Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). Grand Aerie contends, however, that, while it may give rise to liability under a veil-piercing theory, the right to control a related but distinct corporation does not establish jurisdiction absent a connection between that control and the operative facts of the litigation.

We agree with both contentions to some extent. Although pleading a control-based tort and alleging facts of control over a Texas company could satisfy the minimum contacts analysis, there must still be a substantial connection between the control and the operative facts of the litigation. If the car accident arose from or was related to Grand Aerie's control, e.g., Grand Aerie established the training requirements for bartenders, the amount to serve, or when to cut off patrons, Grand Aerie's control might have the requisite substantial connection. *See Commonwealth Gen. Corp. v. York*, 177 S.W.3d 923, 925 (Tex. 2005). Further, if the control was substantial enough that the corporate form should be disregarded, the trial court could

exercise general jurisdiction over Grand Aerie by piercing the corporate veil. *See id.* Assuming without deciding that Grand Aerie made sufficient minimum contacts with Texas to satisfy due process, we conclude that neither of Haygood's causes of action arose from or relate to those contacts.

First, Grand Aerie's liability is not the subject matter of the dram shop action because the majority of the trial would focus on the service of alcohol before the factfinder would determine whether Grand Aerie is vicariously liable. We determine the subject matter of a case by first assessing the operative facts of the litigation. In *Moki Mac*, the family of a Texas resident brought a wrongful death suit against Moki Mac, alleging negligent misrepresentation in touting its safety standards in promotional material it sent to Texas. 221 S.W.3d at 573. The operative facts principally concerned "the guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising [the decedent]." *Id.* at 585. Because the majority of a trial would have focused on the manner in which the hike was conducted before the misrepresentation claim would have been reached, the alleged misrepresentation was "not the subject matter of the case." *Id.* (quoting *Rush v. Savchuk*, 444 U.S. 320, 329 (1980)). Although there was a connection between the misrepresentation and the death, the court did "not believe it [was] sufficiently direct to meet due-process concerns." *Id.*

"The Dram Shop Act imposes liability on alcohol beverage providers for damages proximately caused by the intoxication of individuals who were served despite being obviously drunk." *20801, Inc. v. Parker*, 249 S.W.3d 392, 395 (Tex. 2008) (citing TEX. ALCO. BEV. CODE ANN. § 2.02(b) (West 2007)). A "provider" is the person who sells or serves alcohol under authority of a license. TEX. ALCO. BEV. CODE ANN. § 2.01(1) (West 2007). Although the server or bartender may be liable, that liability is not imputed to an employer who requires its servers to attend an approved alcohol-service class if the server actually attended the class, unless the employer encouraged service of intoxicated persons. TEX. ALCO. BEV. CODE ANN. § 106.14(a) (West Supp. 2012). The bartender is liable if Haygood prevails on his dram shop claim, and Broncho is liable if the bartender's actions can be imputed to Broncho. The operative facts of the case principally concern the bartender's conduct and whether the person was obviously intoxicated. Only then would the factfinder determine whether Grand Aerie may be vicariously liable for Broncho's actions. Grand Aerie's derivative liability is not the "subject matter of the

7

case," and, thus, there is no substantial connection between Grand Aerie's contacts in Texas and the dram shop action.

Haygood's second claim focuses on whether Grand Aerie had a duty to reasonably supervise Broncho's alcohol service because Grand Aerie exercised control over alcohol service. "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." RESTATEMENT (SECOND) OF TORTS § 414 (2012); *see also Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) (adopting rule from Section 414 of the Restatement for negligent control claims). To hold an employer liable for the acts of an independent contractor:

> [T]he employer must have retained at least some degree of control over *the manner in which the work is done*. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his *methods of work*, or as to *operative detail*. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Section 414 cmt. c (emphasis added). In *Redinger*, a general contractor retained control of the independent contractors on a job site by coordinating the work between the various contractors. *Redinger*, 689 S.W.2d at 418. When a concrete truck arrived, the general contractor ordered one of its independent contractors to immediately move a pile of dirt to another location because the pile was blocking the route to the work area. *Id.* at 417. The dirt was located close to where employees of another contractor were working, and the box blade of the tractor crushed the finger of one of those employees. *Id.* Because the general contractor retained control by coordinating the work between two subcontractors, it had a duty to exercise that control with reasonable care. It breached that duty by permitting the subcontractor to operate his tractor near other workers and by failing to warn the nearby workers. *Id.* at 418.

Haygood relies on the following evidence to show control over Broncho's alcohol policies: (1) while Broncho governed its own alcohol practices through local bylaws, the bylaws are subject to approval by Grand Aerie and (2) excerpts from the Articles of Incorporation, existence of a compliance officer, and the role of the program department show that "Grand

Aerie undertook to aid [Broncho] in problematic aspects of their activities, and that it had the means of discovering and remedying dangerous alcohol policies." The crux of Haygood's argument is that Grand Aerie's failure to notice and remedy Broncho's "dangerous practices" constituted negligence in its supervision, oversight, and/or dominion of the local aerie.

Haygood alleged that Grand Aerie controls and supervises Broncho's "rituals and operations" by issuing a "detailed set of policies." Specifically, Haygood contended that Grand Aerie approves the bylaws and amendments to bylaws and that the bylaws and House Rules govern operation of the social rooms. The compliance officer reviews procedures connected to liability insurance and bonding of officers; the program department is charged with "assisting Local Aeries" with social programs; and the general auditor reviews "fiscal" matters. Haygood alleged that this evidence, taken together, shows that Grand Aerie exercised control and could have discovered and remedied dangerous alcohol policies. In response, Grand Aerie argues that it committed no "act in Texas that was 'substantially connected'" to the lawsuit and, more specifically, that there is no substantial connection between Grand Aerie's right to approve Broncho's bylaws and the claims.

Regardless of whether Grand Aerie in fact exercised control, there must be a substantial connection between Grand Aerie's control and the subject matter of the claim. Thus, Grand Aerie's control must be substantially connected to alcohol service. While Grand Aerie reserved the right to approve bylaws, Haygood did not direct us to any alcohol-related policies contained in the bylaws, and further, Grand Aerie's constitution states that both the house rules and bylaws of a local aerie are the exclusive governing authority of members and guests in social rooms. Although the compliance officer, general auditor, and program department assisted, audited, and counseled the local aeries, without evidence that these activities related to alcohol service or Broncho's relationship with its employees, any alleged control is insufficient to establish jurisdiction over the nonresident corporation.

Although Haygood argued both that "GRAND AERIE controls and supervises [Broncho's] activities, alcohol-related policies, and insurance decisions" and that it is the duty of the compliance officer to "ensure that they have adequate education, training, and oversight in connection with the serving of alcohol," Haygood did not cite to evidence in the record to support this proposition nor did we find any in our review of the record. Instead, the only evidence of alcohol-service policies that we found was located in Charlie Waid's deposition

9

testimony, which revealed that Broncho requires its bartenders to attend and pass an alcohol seller training program approved by the Texas Alcoholic Beverage Commission. By statute, the acts of an employee who may be liable in a dram shop action are not imputed to the employer if the employer requires a commission-approved training program for employees serving alcohol and does not encourage improper service. TEX. ALCO. BEV. CODE ANN. § 106.14(a) (West Supp. 2012). The deposition testimony established that the TABC-approved training is a policy "that the local chapter seeks to enforce," rather than mandated by Grand Aerie.

The injuries for which Haygood seeks recovery are based on the service of alcohol in Ector County, Texas. The relationship between the operative facts and Grand Aerie's supervision is simply too attenuated to satisfy specific jurisdiction's due process concerns because there is not a substantial connection between Grand Aerie's contacts in Texas and alcohol service on the evening in question. Accordingly, we conclude that the trial court lacked specific jurisdiction over Grand Aerie. Grand Aerie's third issue is sustained.

Even if a nonresident defendant's contacts with the forum are wholly unrelated to the cause of action, a trial court has general jurisdiction over a nonresident defendant whose contacts in a forum are continuous and systematic. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984); *Guardian Royal*, 815 S.W.2d at 228. The minimum contacts analysis for general jurisdiction is more demanding than the "substantial connection" required for specific jurisdiction; instead, there must be evidence that the defendant conducted "substantial activities" within the forum. *CSR Ltd.*, 925 S.W.2d at 595 (citing *Guardian Royal*, 815 S.W.2d at 228). The analysis is "dispute blind" because we do not consider the nature of the claim presented. *PHC-Minden*, 235 S.W.3d at 169. We do not consider the contacts in isolation but look for a "pattern of continuing and systematic activity." *Coleman*, 83 S.W.3d at 809. Although the quantity of contacts can suggest a pattern of activity, it is the quality of those contacts that supports general jurisdiction. *Id.* at 809–10. "Each defendant's contacts with the forum State must be assessed individually," so we must look only to Grand Aerie's purposeful contacts with Texas. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984).

Although Haygood expressly rejected reliance on a veil-piercing theory, the allegations in his original petition can be read to allege that the trial court has general jurisdiction over Grand Aerie as Broncho's alter ego. In response, Grand Aerie contends that the relationship between it and Broncho is a typical parent relationship. Therefore, before we assess whether Grand Aerie's

contacts rise to the level of continuous and systematic, we will first address whether we can attribute Broncho's contacts to Grand Aerie through jurisdictional veil-piercing.

A trial court may have personal jurisdiction over a nonresident defendant if the relationship between the foreign corporation and its subsidiary that does business in Texas is one that would allow the court to impute the subsidiary's "doing business" in Texas to the parent corporation. *BMC Software*, 83 S.W.3d at 798. This is only permissible when "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Id.* (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)). Texas law presumes that separate corporations are distinct entities. *York*, 177 S.W.3d at 925.

> The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime.

*BMC Software*, 83 S.W.3d at 798 (quoting *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 339 (Tex. 1968)). Thus, absent veil-piercing, "[e]ach defendant's contacts with the forum State must be assessed individually." *Keeton*, 465 U.S. at 781 n.13.

We note that "jurisdictional veil-piercing" is distinct from "substantive veil-piercing," so imputing a related entity's contacts for jurisdictional purposes requires a showing that the parent controls the subsidiary's internal operations and affairs. *PHC-Minden*, 235 S.W.3d at 174, 175; *BMC Software*, 83 S.W.3d at 799. The parent's degree of control must be more than is typical with common ownership and directorship. *BMC Software*, 83 S.W.3d at 799. To disregard the corporate fiction, there must be evidence that "the two entities cease to be separate." *Id.*

To determine whether Grand Aerie is the alter ego of Broncho, we review the record for "atypical control" over Broncho's operations or typical "parental involvement" that is consistent with their legal form. *See PHC-Minden*, 235 S.W.3d at 176. "Appropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies." *Id.* (citing 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 108.42[3][b] (3d ed. 2007)). Inappropriate parental control is evidenced by the "plus" factor: "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id.*

The record shows that Broncho listed Grand Aerie as a "related entity" on Broncho's income tax return. Also, Grand Aerie lists information on its website for potential members, including member benefits, and directs questions and interested persons to the local chapters. The excerpts from the governing documents show that Grand Aerie requires local aeries to carry liability insurance, list Grand Aerie as an additional insured, and carry a minimum liability amount of $1,000,000. Grand Aerie also has a "Program Department" that assists the local aeries in recruitment and membership. Deposition testimony shows that Grand Aerie granted a charter to the Broncho Aerie, that the deceased member in this case was a past president and past trustee, and that the local aeries pay dues on behalf of their members. The affiliation agreements state that Grand Aerie owns the name "Fraternal Order of Eagles," that Broncho agrees to "submit to the authority of the Grand Worthy President," and that local aeries are "a subordinate unit of the Grand Aerie." The compliance officer reviews, counsels, and directs ongoing procedures related to insurance, bonding, tax payments to Grand Aerie, and collecting past-due fees and supply charges. Finally, Broncho must submit reports twice annually to Grand Aerie that lists cash on hand, investments, value of property, insurance coverage, and membership dues collected.

Upon close examination, it is clear that Grand Aerie does not exercise the type of control over Broncho that is required to impute the local chapter's contacts to Grand Aerie for jurisdictional purposes. For example, in its affiliation agreement with local chapters, Grand Aerie agrees to "recognize the autonomy of the Local Aerie . . . and its power and authority to conduct the business of the Local Aerie, not in conflict with the Laws of the Order." Grand Aerie also agrees to "assist" the Local Aerie in various ways. In the same agreement, the *local* chapter agrees to "use its best efforts to ensure that its leadership receives training and education on issues relevant to the Local Aerie." Grand Aerie and local chapters agree to "acknowledge that they are separate and autonomous legal entities[] and that the Local Aerie is not operationally controlled in its daily governance and decision-making by the Grand Aerie." Further, the evidence falls short of establishing atypical domination because it is incomplete. The evidence does not show whether the compliance officer is a national or local position, what Grand Aerie does with the biannual audit reports, or what the role of the program department is beyond assisting the local aeries with membership and recruitment.

Instead, the record reveals typical parental control by merely supervising performance, supervising finances, and articulating general policies. For instance, if a local aerie wishes to hire a manager for its social or buffet rooms, Grand Aerie requires the chapter to amend its bylaws to provide for this position, obtain the membership's approval of the manager's duties, and hire the manager as its own employee. In addition, the AFO's handbook instructs a local aerie to conduct monthly audits but to maintain the reports for its own records, sending only the biannual reports to Grand Aerie.

We find no evidence of control other than typical parental oversight and cannot impute Broncho's contacts in Texas to Grand Aerie. We conclude that there is no evidence to support any implied findings by the trial court that Grand Aerie was Broncho's alter ego. Grand Aerie's first issue is sustained.

We will now address Grand Aerie's second issue: whether Grand Aerie itself has continuous and systematic contacts with Texas to support jurisdiction. The general jurisdiction inquiry is a tedious process that "demands . . . that all contacts be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuous and systematic activity." *PHC-Minden*, 235 S.W.3d at 170 (quoting *Schlobohm v. Schapiro*, 784 S.W.2d 355, 359 (Tex. 1990)). In conducting a "dispute blind" inquiry, we do not consider Haygood's status as a Texas resident, his actions directed at Grand Aerie, or acts by third parties. Instead, we focus solely on evidence of "substantial activities" or a pattern of ongoing activity between Grand Aerie and Texas. *See Coleman*, 83 S.W.3d at 809.

Haygood alleges that the following evidence shows that Grand Aerie availed itself of the benefits and protections of Texas law: Grand Aerie received dues from Texas members; Grand Aerie received charitable funds from Texas fundraisers; a third-party website listed Grand Aerie's charitable activities; a Texas Lottery Commission report referenced Grand Aerie; and Grand Aerie applied for a taxpayer number and qualifies for tax exemptions in Texas. None of these contacts is clearly detailed in the record. Alleging that Grand Aerie does all of these things does not provide us with enough information to properly investigate, compile, sort, and analyze the information for proof of continuous and systematic activities in Texas. *See Schlobohm*, 784 S.W.2d at 357. A large portion of Haygood's evidence consists of printouts from Grand Aerie's current website, which are very general and do little to inform us about the quality of Grand Aerie's purported contacts in Texas. Furthermore, as Grand Aerie argues, the information on its

13

website is not probative in our jurisdictional analysis. The Texas Supreme Court determined that the relevant contacts are those that exist up to the time of filing suit. *PHC-Minden*, 235 S.W.3d at 169. Haygood failed to show that, although the documents were dated after filing the suit, this was the same information that was on the website before and at the time of filing suit. Even if we consider those documents, however, they are too general to establish a continuous and systematic pattern of activity in Texas. Additionally, receiving dues and charitable funds and being listed on a third-party website, without more, is merely evidence of acts by third parties rather than purposeful contacts of Grand Aerie.

Instead, the documents tend to establish that Grand Aerie has designed its structure so that it would not benefit from the laws of Texas. The Texas Supreme Court recently instructed:

> General jurisdiction is premised on the notion of consent. That is, by invoking the benefits and protections of a forum's laws, a nonresident defendant consents to being sued there. When a nonresident defendant purposefully structures transactions to avoid the benefits and protections of a forum's laws, the legal fiction of consent no longer applies.

*Coleman*, 83 S.W.3d at 808. Grand Aerie submitted evidence that it has designed its structure so that it rarely, if at all, deals directly with its members in their home state. For instance, Grand Aerie established a tripartite system for membership dues. The local aeries set the amount of dues, members pay dues to the local chapter, and each chapter sends Grand Aerie a per capita fee. The FOE has more than 1,560 local chapters throughout the United States and Canada. Grand Aerie's principal place of business is located in Ohio, and it is incorporated under the laws of Ohio. During the last thirty years, Grand Aerie has not had offices, employees, or a registered agent for service of process in Texas. Grand Aerie and Broncho have no shared employees, and Grand Aerie maintains no governance over them. Grand Aerie does not own property or assets in Texas and does not have a bank account or a mailing address in Texas, nor is there evidence that it has ever advertised or paid taxes in Texas.

Although a defendant that structures its affairs to avoid personal jurisdiction may nonetheless be subject to suit in Texas if it has benefited from Texas law, Haygood has not sufficiently indicated how Grand Aerie has benefited. Haygood alleged that Grand Aerie "sought the necessary approval from the State of Texas to obtain benefits from its local chapter's gambling activities" and that Grand Aerie applied for a taxpayer number and qualifies for exemptions for franchise, sales and use, and property taxes in Texas. Grand Aerie argues in

response that, although its name appears on a report by the Texas Lottery Commission and a taxpayer number exists in Grand Aerie's name, this is not evidence of purposeful actions taken by Grand Aerie. We agree.

A Texas organization can obtain a taxpayer number based on the federal tax exempt status of a related entity. The Internal Revenue Code exempts qualified organizations from federal income taxation and permits a deduction for charitable contributions made to those organizations. 26 U.S.C. §§ 170, 501. To relieve the IRS from the burden of processing additional applications, related entities can obtain a group exemption letter. Rev. Proc. 80–27, 1980-1 C.B. 677. Texas enacted similar exemptions for entities that obtained the federal § 501(c)(8) group exemption. TEX. TAX CODE ANN. § 151.310(a)(2) (West Supp. 2012), § 171.063(a)(1) (West 2008). Thus, because a local aerie is free to obtain a tax exemption in Texas by using the federal group exemption number without any action on the part of Grand Aerie, the existence of a taxpayer number is not evidence of a contact between Grand Aerie and Texas. In fact, an affidavit from the "Accounts Examiner V in the Exempt Organizations Section" of the Texas comptroller's office reveals that the examiner located "a request for exemption that was submitted by one of the local Aeries under the national organization's federal group exemption." Similarly, the Texas Lottery commission listing Grand Aerie as an "INTEREST GROUP" in its self-evaluation report does not establish a purposeful act in Texas because the form defines interest groups as those that are "affected by agency actions *or that represent others served by or affected by agency actions* (emphasis added)." Because the nature of Grand Aerie's representation is not known and because a local chapter could have unilaterally listed Grand Aerie as a representative, without further explanation and support, the evidence falls short of establishing a purposeful contact by Grand Aerie with the forum.

Grand Aerie's limited contacts with the forum do not constitute continuous and systematic contacts but, instead, indicate that Grand Aerie structured its organization so that it would not benefit from the laws of the State and, thus, would not be subject to suit here. Accordingly, we conclude that the trial court lacked general jurisdiction over Grand Aerie. Grand Aerie's second issue is sustained. Because we conclude that Grand Aerie did not have sufficient minimum contacts—for specific or general jurisdiction—to satisfy due process, we do not reach the second prong of the personal jurisdiction analysis, which addresses traditional notions of fair play and substantial justice and is addressed by Grand Aerie in its fourth issue.

15

We hold that Grand Aerie's contacts with Texas do not arise from or relate to Haygood's claims. We also hold that Grand Aerie does not have continuous and systematic contacts with Texas and that there is no basis for imputing Broncho's Texas contacts to Grand Aerie. Accordingly, we reverse the judgment of the trial court and render judgment that Haygood's claims against Grand Aerie are dismissed for want of jurisdiction.

JIM R. WRIGHT
CHIEF JUSTICE

February 21, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.